UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
_____
                               :
THOMAS NEVIUS,                 :
                               :
        Petitioner,            :    Civ. No. 17-4587 (NLH)
                               :
     v.                        :    OPINION
                               :
THE ATTORNEY GENERAL FOR THE   :
STATE OF NEW JERSEY, and       :
STEVEN JOHNSON,                :
                               :
        Respondents.           :
_____:
```

APPEARANCES:
Thomas Nevius, No. 201449E
New Jersey State Prison
PO Box 861
Trenton, NJ 08625
      Petitioner pro se

Stephen C. Sayer
Cumberland County Prosecutor's Office
115 Vine Street
Bridgeton, NJ 08302
      Counsel for Respondents

HILLMAN, District Judge

Petitioner Thomas Nevius ("Petitioner"), a prisoner presently incarcerated at New Jersey State Prison in Trenton, New Jersey, has filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). See ECF No. 1. Respondents the Attorney General for the State of New Jersey and Steven Johnson ("Respondents") filed an Answer to the Petition (the "Answer"). See ECF No. 8. For the following reasons, the Court will deny the Petition and a certificate of appealability shall not issue.

# I.  BACKGROUND

In its opinion on direct appeal, the Superior Court of New Jersey, Appellate Division provided the following summary of the factual background of Petitioner's case:

> According to the State's proofs, Ruth Walker, the homicide victim, was a fifty-two-year-old woman living alone in a one-bedroom apartment at the Chestnut Square Apartment complex in Vineland. On Tuesday, July 30, 2002, her daughter Janira Walker-Castro, who was visiting from Florida, and her extended family spent the day in Wildwood. Ruth, however, stayed home because she was tired.
>
> At 8:19 p.m., Janira called her mother on the cell phone she left with her, letting her know when the family would arrive for a dinner that Ruth planned to cook. Surveillance video at the Chestnut Square Apartment complex showed Ruth pulling into her parking space at 8:22 p.m., and exiting the van. When Janira phoned her mother again close to 10:00 p.m., there was no answer.
>
> Later, the family arrived at Ruth's apartment and found it dark; the outside and inside doors were locked. No one had a key so Anthony Reyes, the victim's son, using a knife from his nearby home, eventually opened the outside door, and then easily gained entry to the inner door.
>
> Janira's husband went into the bedroom and discovered the victim, who was clothed and wearing necklaces, lying on her back on the floor. She had no pulse. The bedroom was in disarray; the folding closet doors were on the floor, a table was broken, and the bedding was disheveled.
>
> There was a blood-stained white, Fruit of the Loom T-shirt, size XXXL, on the bed, along with a bracelet. According to Janira, who was

familiar with her mother's wardrobe, the victim did not wear or even own white Fruit of the Loom T-shirts. Police also found $391 in cash on top of the kitchen table, along with a cell phone and Ruth's keys. All of the windows were found to be locked and the sliding glass door secure; however, the rear kitchen screen had a small incision in it, but it was in a locked down position, and no entry could have been gained from it. There was a pot of water on the stove and meat defrosting in the sink, which led Vineland police officer Robert DeMarchi to surmise that as the victim started to prepare dinner, she heard a noise in the bedroom and took a knife with her to investigate.

Dr. Elliott Gross, the Cumberland County Medical Examiner at the time, performed an autopsy the next day. He determined that the victim, who was five-feet-six inches tall and weighed 225 pounds, was stabbed three times in the neck, with one of the stab wounds transecting the jugular vein and going through two of the vertebrae, which caused blood and air to reach the heart causing death. Due to the way the blood seeped down the victim's breasts, Gross believed the neck wounds were caused while she was standing.

Additionally, the victim's hyoid bone (in the neck) was fractured. That fracture, combined with petechiae in the victim's eyes, and necklace imprints around her neck, led Gross to conclude that the victim also had been strangled. Gross could not say for sure whether the strangulation had been done manually or with a ligature, but said both could have been used. Specifically, the T-shirt found on the bed could have been used as a ligature. Gross thought it likely that the person who strangled the victim was standing behind her because the marks did not extend all the way around her neck.

The injuries—the stab wound and the strangulation—occurred nearly concurrently,

and each was capable in and of itself of causing her death. Gross believed that the victim's death was caused by more than one person because the two competing causes of death occurred nearly simultaneously and it would not have been likely that one person could have strangled her from behind and stabbed her from the front. In addition to the two fatal wounds, the victim had abrasions, bruises and cuts on her body that indicated she struggled with her attacker or attackers and tried to defend herself. Gross testified that a wooden-handled knife with a serrated edge, later recovered and identified as the victim's, could have caused the fatal stab wound.

Ian Hood, who was qualified as an expert in forensic pathology, reviewed Gross's autopsy report and photographs from the scene, and examined the recovered knife. He concurred with Gross's determination of the causes of death, that the knife presented was consistent with the stab wounds, that the T-shirt could have been used as a ligature, and that the victim was standing up and struggling when she was strangled from behind and stabbed from the front by two different people.

Police investigation quickly focused on William Boston, who lived next door to the victim. Their apartments shared a common outer door. In July 2002, Damien Stratton lived with Boston, Boston's mother, and Boston's step-father. He was "trying to get [him]self together" after having been in prison for convictions on burglary and drug possession charges. Stratton knew defendant, and said that the day the victim was killed, defendant and Boston were together all day, and in the evening, they were "messing with" the screen in the victim's kitchen window; defendant had a knife and Boston had a box cutter. Stratton told Boston's step-father that the men were messing with the screen and at the step-father's insistence, Boston went inside. Boston went out again to rejoin defendant

4

before Stratton left for the evening. Stratton admitted to having had "some drinks" that night.

On the day of the homicide, from 1:15 p.m. to 4:30 p.m., Boston did "community service" in one of the apartments (37A) at the Parktown Apartments, helping the maintenance worker Jose Lopez clean the vacant roach-infested premises for re-renting. Earlier, on July 29, Lopez had applied boric acid powder to all of the surfaces in the apartment, including the kitchen cabinets, and found nothing on top of them. The next day, which was the day after the homicide, Boston worked from 3:00 p.m. until 5:00 p.m. No one had access to the apartment besides Lopez and Boston, and Boston did not have a key. A week later, Lopez reentered the apartment and found a wooden-handled knife with a six-to-eight-inch blade, sitting on top of a kitchen cabinet; it had no boric acid powder on it. Lopez turned the knife over to police, which Janira said looked "exactly like" the one used by her mother.

Boston was arrested on August 2, 2002, and charged with the homicide. At that point, Stratton, Beals, and Cesar Caban, a large friend of Boston's who could have fit the XXXL T-shirt, were suspects; defendant was not. At some later time, Stratton was eliminated as a suspect because his alibi was confirmed, and forensic tests on DNA found on the bloody T-shirt did not compare to Stratton's profile. Subsequently, it was also determined that the DNA on the T-shirt and a palm print did not match Boston's, Beals' or Caban's profiles. However, police believed that Boston did not act alone due to his limited intelligence, and the fact that he was not a big person and would not fit an XXXL T-shirt.

On September 10, 2003, Vineland Police Detectives Shane Harris and Negron asked defendant to come to the station, and he complied. When they asked him to provide buccal swabs, defendant's body started to

shake and his eyes watered. Defendant then said he felt like he was being set up, but he would provide the swabs because if he did not, it would seem like he was hiding something. Several weeks later, under court order, defendant provided a palm print impression. When confronted with the court order for the palm print, defendant got upset and said that he had never been in the victim's apartment.

Leslie Wanko, a supervisory forensic analyst for the FBI, conducted tests on the latent palm print found in the victim's bedroom, and determined with "100% certainty" that it matched defendant's palm print. Maureen Lo-Beer, an expert in toxicology, biochemistry and DNA analysis at the New Jersey State Police forensic laboratory, conducted DNA testing on the white XXXL T-shirt and found that she "could not exclude" defendant as the contributor of the DNA material found on the white T-shirt. The profile she found could be expected to be found in 1 of 480 million African-Americans, one in 786 million Caucasians, and 1 in 1.46 billion Hispanics.

Defendant was arrested on October 10, 2003. He gave a taped statement to police in which he denied ever being in the victim's apartment. At the end of the statement, Detective John Berry of the Cumberland County Prosecutor's Office asked defendant how, if he was never in her apartment, did his DNA get in her apartment. Defendant went into a "tirade" and said he was not there, he should not have consented to the buccal swab sample and that the police planted the evidence.

Under authority of a search warrant, Detective Lieutenant James Parent of the Cumberland County Prosecutor's Office conducted a search of defendant's bedroom on October 10, 2003. One of the items found was an XXXL Fruit-of-the-Loom T-shirt, which Parent described as "like a muscle shirt with the sleeves cut off" and "sort of what was found at the crime scene." Other sizes and types of T-shirts were

also found, but only the XXXL shirt had cut-off sleeves. Gina Mave, who knew defendant through her position as the rental manager at the Parktown Apartments where defendant had resided, said defendant often wore shirts with the sleeves cut off, as he was a weight lifter. When shown the shirt recovered from his apartment, Mave agreed that it was the type of shirt defendant frequently wore. Parent identified the shirt found in the victim's apartment and the shirt found in defendant's bedroom as both being white XXXL T-shirts with the sleeves cut off.

Stephanie Beine of Genetics Technologies, Inc., testified as an expert for the defense. Her laboratory used the same processes as the State Police laboratory to test DNA. Under instruction from defendant's previous attorney, Beine focused on three areas of the T-shirt that had blood stains. She did not perform any DNA analysis on the other biological fluid or "epithetical cells" that may have been present, despite seeing "areas of fluorescence on the garment that would indicate possible other biological fluids being present." Beine found bloodstains "A" and "C" to contain a mixture of DNA from two contributors, one male and one female, but the genetic material detected from the male contributor fell below the laboratory's reporting threshold, and thus, she was not able to "include or exclude" defendant as a contributor.

Defendant, who represented himself at trial, testified on his own behalf. He admitted to being at Boston's apartment on July 30, 2002, but denied having anything to do with the victim's death. When asked how his DNA was found in the victim's apartment, he stated, "[m]y DNA is not nowhere in nobody's apartment." He also stated: "[m]y [palm] print is nowhere inside nobody's apartment except for my own." Defendant maintained that he had a job, as did his fiancée at the time, so he did not need "to steal from nobody." He

> admitted wearing T-shirts with the sleeves cut
> off as he was a weightlifter, but claimed that
> some of the shirts in his bedroom belonged to
> his step-son. He did not know how a bloody T-
> shirt got into the victim's apartment. He
> believed the prosecutor "put ... up" the
> laboratory witnesses to lie. Defendant
> declared his innocence and said he did not
> know who killed the victim.

State v. Nevius, No. A-5438-07T4, 2012 WL 2361516, at *1-4 (N.J.

Super. Ct. App. Div. June 18, 2012) (internal footnotes omitted).

The jury convicted Petitioner of two counts of first-degree

murder, one count of second-degree burglary, and one count of

third-degree conspiracy to commit burglary. See ECF No. 8-9.

Petitioner was sentenced to an aggregate term of sixty-five years

in prison, subject to New Jersey's No Early Release Act ("NERA").

See id. Petitioner appealed his conviction and sentence. See ECF

Nos. 8-10, 8-11. On June 18, 2012, the Appellate Division affirmed

both Petitioner's conviction and his sentence. See Nevius, 2012

WL 2361516, at *21. The New Jersey Supreme Court denied

Petitioner's request for a writ of certiorari. State v. Nevius,

65 A.3d 835 (N.J. 2013).

Petitioner subsequently filed a petition for post-conviction

relief ("PCR") in state court. See ECF Nos. 8-12, 8-13. The PCR

court denied the petition. See ECF No. 8-26. Petitioner's motion

for reconsideration of his PCR was also denied. See ECF No. 8-

28. The Appellate Division affirmed the denial of Petitioner's PCR

and his motion for reconsideration. See State v. Nevius, No. A-

3982-14T4, 2017 WL 588186, at *4 (N.J. Super. Ct. App. Div. Feb. 14, 2017).  The New Jersey Supreme Court denied Petitioner's request for a writ of certiorari.  See State v. Nevius, 167 A.3d 655 (N.J. 2017).

On June 8, 2017, Petitioner filed the instant habeas petition, pro se.  See ECF No. 1.  On September 8, 2017, Respondents filed an answer opposing the petition.  See ECF No. 8.  Petitioner submitted two briefs in reply.  See ECF Nos. 9, 10.

## II.  STANDARD OF REVIEW

A petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is the proper mechanism for a state prisoner to challenge the fact or duration of his confinement where the petitioner claims his custody is in violation of the Constitution or the laws of the United States.  See 28 U.S.C. § 2254(a); Cullen v. Pinholster, 563 U.S. 170, 181 (2011); Preiser v. Rodriquez, 411 U.S. 475, 498-99 (1973).  A habeas petitioner bears the burden of establishing his entitlement to relief for each claim presented in the petition. See Harrington v. Richter, 562 U.S. 86, 98 (2011).

The standard used in reviewing habeas claims under § 2254 depends on whether those claims have been adjudicated on the merits by the state court.  If they have not been adjudicated on the merits, the Court reviews de novo both legal questions and mixed factual and legal questions.  See Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).  If the state court adjudicated the claim on the

merits, then 2254(d) limits the review of the state court's

decision as follows:

> An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the
> judgment of a State court shall not be granted
> with respect to any claim that was adjudicated
> on the merits in State court proceedings
> unless the adjudication of the claim –
>
> (1)  resulted in a decision that was contrary
>      to, or involved an unreasonable
>      application of, clearly established
>      Federal law, as determined by the Supreme
>      Court of the United States; or
>
> (2)  resulted in a decision that was based on
>      an unreasonable determination of the
>      facts in light of the evidence presented
>      in the State court proceeding . . . .

28 U.S.C. § 2254(d).

If a claim has been adjudicated on the merits in state court,[1]

this Court has "no authority to issue the writ of habeas corpus

unless the [state court's] decision 'was contrary to, or involved

---

[1] "[A] claim has been adjudicated on the merits in State court
proceedings when a state court has made a decision that finally
resolves the claim based on its substance, not on a procedural,
or other, ground." Lewis v. Horn, 581 F.3d 92, 100 (3d Cir.
2009) (quoting Thomas v. Horn, 570 F.3d 105, 117 (3d Cir.
2009)). "Section 2254(d) applies even where there has been a
summary denial." Pinholster, 563 U.S. at 187. "In these
circumstances, [petitioner] can satisfy the 'unreasonable
application' prong of § 2254(d)(1) only by showing that 'there
was no reasonable basis' for the [state court's] decision." Id.
(quoting Harrington v. Richter, 562 U.S. 86, 98 (2011); see also
Johnson v. Williams, 568 U.S. 289, 301 (2013) ("When a state
court rejects a federal claim without expressly addressing that
claim, a federal habeas court must presume that the federal
claim was adjudicated on the merits – but that presumption can
in some limited circumstances be rebutted.").

an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Parker v. Matthews, 567 U.S. 37, 40 (2012) (quoting 28 U.S.C. § 2254(d)).

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' [and] therefore cannot form the basis for habeas relief under AEDPA." Parker, 567 U.S. at 48-49 (quoting 28 U.S.C. § 2254(d)(1)).

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), if the state court applies a rule that "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result.]" Williams, 529 U.S.

at 405–06. Under the "'unreasonable application' clause of §
2254(d)(1), a federal habeas court may grant the writ if the state
court identifies the correct governing legal principle from [the
Supreme Court's] decisions but unreasonably applies that principle
to the facts of the prisoner's case." Williams, 529 U.S. at 413.
"[A]n unreasonable application of federal law," however, "is
different from an incorrect application of federal law."
Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Williams,
529 U.S. at 410).

## III. DISCUSSION

### A. Inadmissibility of Co-Defendant's Statement

In Ground One, Petitioner argues that his due process right
to present a defense was violated when the trial court prohibited
him from introducing statements made by co-defendant Boston. See
ECF No. 1-1, at 4. Specifically, Petitioner sought to introduce
Boston's statement to police that he and another individual, Tyrone
Beals, had committed the crime. See id. at 4-5.

When Boston was arrested, he initially told law enforcement
that it was Beals who had broken into the victim's apartment and
stabbed the victim when she returned home. See State v. Nevius,
45 A.3d 360, 366 (N.J. Super. Ct. App. Div. 2012). Boston later
alter his statement to police, this time stating that he had
entered the victim's apartment with Beals but had hidden inside a
bathroom while Beals stabbed the victim. See id. In another

subsequent statement to police, Boston again changed his story, this time alleging that Beals had threatened Boston until Boston agreed to break into the apartment. See id. Boston stated that he had broken into the apartment with Beals but left once he saw the victim had returned home. See id. Boston added that when he heard screaming, he returned to the apartment in an attempt to stop Beals from killing the victim but was unsuccessful. See id. Boston stated that after Beals stabbed and strangled the victim, Boston removed the t-shirt Beals used to strangle the victim and used it to clean off the knife. See id.

While Boston was in prison awaiting his trial, he provided yet another statement, this time to a fellow inmate, which stated that it was actually Boston and Petitioner who had committed the crime. See id. Boston confessed to the other inmate that Boston had "intentionally changed the actors in his written narrative to the police, and that whatever he said Beals had done, [Boston] had actually done, and whatever [Boston] said that he had done, [Petitioner] had actually done." Id. Boston also wrote a letter to the prosecutor in his case, alleging his statement to police had been coerced and the version of events that he provided to police the day he was arrested was inaccurate. See ECF No. 8-5, at 6. Boston was tried separately from Petitioner and was convicted on all counts, including first-degree murder and conspiracy to commit murder. See State v. Boston, No. A-4129-

07T3, 2012 WL 3568290, at *1 (N.J. Super. Ct. App. Div. Aug. 21, 2012). Boston refused to testify at Petitioner's trial. See ECF No. 8-5, at 3-4.

At Petitioner's trial, Petitioner attempted to introduce Boston's statement to police that Boston and Beals had been the perpetrators of the crime. See id. During cross-examination of State's witness Detective Negron, Petitioner asked, "isn't it true that Mr. Boston told you that Tyrone Beals killed Ms. Walker?" ECF No. 8-2, at 6. The State objected and the trial court ruled that the question was inadmissible hearsay. See id. at 6-7. During Petitioner's case-in-chief, he again sought to introduce Boston's statement to police. See ECF No. 8-5, at 3. Petitioner informed the court that Boston refused to testify at trial and that, in lieu of Boston's live testimony, Petitioner wanted to introduce Boston's statement to police as a statement against penal interest. See id. at 4. The trial court ruled the statement was inadmissible hearsay and that it could not be admitted as a statement against penal interest because it "lacked a certain reliability that would normally be associated with a statement against penal interest." See ECF No. 8-5, at 44. The trial court found that Boston's statement to police showed Boston as, at best, "an unwilling and reluctant participant in a burglary, in which Tyrone Beals committed a homicide, if one were to believe the statement. This statement [was] made to exculpate [Boston] from

14

the greater of the offenses, that which was probably at one time, a capital murder charge." Id. The trial court determined that the statement had "little, if any, probative value," and that it would be "absolutely unfair and inappropriate" to admit the statement Boston made to police without also allowing into evidence the statement Boston made to his fellow prison inmate, which the court had held was also inadmissible. See id. at 46.

On appeal, the Appellate Division affirmed the trial court's ruling, determining that the trial court had properly barred the statements under New Jersey Rule of Evidence 803(c)(25). See Nevius, 2012 WL 2361516, at *10. The Appellate Division stated that "[i]f anything, the accusatory shifting of blame to Beals served to exculpate not only [Petitioner] but Boston as well and it is for this very reason that Boston's statements are inherently untrustworthy and therefore inadmissible under N.J.R.E. 803(c)(25)." Id. at *9. The Appellate Division held that the ruling did not deprive Petitioner of a fair trial. See id. at *10.

Generally, the admissibility of evidence is a question of state law which is not cognizable on federal habeas review. See Estelle v. McGuire, 502 U.S. 62, 67-70 (1991) (observing that "federal habeas corpus relief does not lie for errors of state law" (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990))); see also Marshall v. Lonberger, 459 U.S. 422, 438 (1983) ("[T]he Due

Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules"). If, however, a petitioner can demonstrate that the admission of the challenged evidence deprived him of the "fundamental elements of fairness in [his] criminal trial," then he may establish a Fourteenth Amendment due process violation. Glenn v. Wynder, 743 F.3d 402, 407 (3d Cir. 2014) (quoting Riggins v. Nevada, 504 U.S. 127, 149 (1992). A petitioner must show that state court's evidentiary ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." Scott v. Bartkowski, Civ. No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing Romano v. Oklahoma, 512 U.S. 1, 12-13 (1994)). Significantly, the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." Dowling v. United States, 493 U.S. 342, 352 (1990).

Here, Petitioner has not demonstrated that the trial court's exclusion of Boston's statements was "so arbitrary or prejudicial" as to render his trial fundamentally unfair. The underpinning of all hearsay exceptions is that the statements are made under circumstances which provide an indicium of reliability. See Williamson v. United States, 512 U.S. 594, 598 (1994); see also Idaho v. Wright, 497 U.S. 805, 820-21 (1990). The Supreme Court has held that "the arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong

motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence." <u>Williamson</u>, 512 U.S. at 601 (1994) (quoting <u>Lee v. Illinois</u>, 476 U.S. 530, 541 (1986)) (internal quotation marks omitted). Here, as the trial court and Appellate Division found, the statements made by Boston were self-serving and helped to exculpate Boston, making him look, at worst, like an unwilling participant to a burglary gone wrong. His statements did not bear the indicia of reliability to make them admissible under a hearsay exception. Thus, the state courts' determination that Boston's statement to police were untrustworthy and therefore inadmissible, was not contrary to, or an unreasonable application of federal law. Petitioner is not entitled to relief on this claim.

### B. Brady Violations

In Ground Two, Petitioner alleges that the State withheld multiple pieces of evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). <u>See</u> ECF No. 1-1, at 6-16. Specifically, Petitioner asserts that the State withheld: Dr. Gross' personnel file; a trace evidence report; the lab notes of FBI forensic analyst Laura Hutchins; and a "biochemical analysis and questionnaire report." <u>See id.</u> at 6. Petitioner argues that these documents were material and favorable to his defense and, if disclosed to the Petitioner, would have had the ability to change

the outcome of his proceeding.  See id. at 6-16.

The government has a duty to provide a defendant with all relevant, exculpatory materials.  See Kyles v. Whitley, 514 U.S. 419, 432 (1995) (citing Brady, 373 U.S. 83).  The government's suppression of material evidence favorable to the defense constitutes a violation of a defendant's due process rights.  See Brady, 373 U.S. at 87.  Evidence is considered material, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  To establish a Brady violation, a petitioner must show that: (1) the evidence at issue was favorable to the defense; (2) the evidence was suppressed by the government; and (3) petitioner was prejudiced as a result.  See Moore v. Illinois, 408 U.S. 786, 794-95 (1972).

i.  *State Pathologist's Personnel File*

Petitioner contends that the State committed a Brady violation by withholding the State pathologist, Dr. Gross', personnel file.  See ECF No. 1-1, at 6-10.  Petitioner argues that the State was aware Dr. Gross had disciplinary infractions in his past and the failure of the State to provide Petitioner with Dr. Gross' personnel file constituted a Brady violation.  See ECF No. 8-12, at 26.  Petitioner submits that, without the personnel file,

he "never had the opportunity to impeach" Dr. Gross.  See ECF No. 1-1, at 7.

The record is unclear as to when and if Petitioner received the Dr. Gross' personnel file.  It appears that on January 28, 2008, one day prior to Dr. Gross' testimony, Petitioner requested a court order to obtain the file from the Human Resources Department of Cape May County.  See ECF No. 8-19, at 25.  The trial court signed the order that same day.  See id. at 28.  It is unclear however whether Petitioner actually received a copy of the personnel file that day as well.

Petitioner did, however, discuss Dr. Gross' disciplinary infractions during his opening statement on January 18, 2008 – before the trial court's order.  See ECF No. 8-1, at 10-11. Petitioner also subsequently cross-examined Dr. Gross about his disciplinary infractions and again utilized the information during closing arguments to attack Dr. Gross' credibility.  See ECF Nos. 8-4, at 26-27; and 8-6, at 83-84.  Petitioner appears to contend that the arguments he made throughout trial about Dr. Gross' disciplinary infractions were based solely upon information he discovered through the media and not derived from the personnel file.  See ECF No. 1-1, at 7.

When Petitioner raised this claim during his PCR proceedings, the PCR court held, in pertinent part:

However, the State did not suppress any of the
evidence related to Dr. Gross. The personnel
file obtained by counsel was not in the
State's possession and the defense could
obtain it without the aid of prosecution — as
evidenced by the fact that defense did obtain
the file without the prosecution's help.
Additionally, Dr. Gross's disciplinary
history could have easily been found as new
outlets covered the stories of an apparent
"botched autopsy" Dr. Gross performed.

Additionally, Petitioner did mention Dr.
Gross's history during his opening, closing
and cross examination of Dr. Gross.
Petitioner does not aver what would have
changed if the material were obtained sooner.
In short, Petitioner knew the specifics of the
history of Dr. Gross and argued that
throughout the course of the trial. He was
fully aware of his history and had the
opportunity to present those arguments in
order to sully the reputation and credibility
of Dr. Gross.

ECF No. 8-27, at 19-20.

The Appellate Division affirmed the PCR court's holding and
found that Petitioner's argument lacked sufficient merit to
warrant discussion in a written opinion. See ECF No. 8-29, at 9-
10.

Here, Petitioner has not demonstrated that he suffered
prejudice as the result of the allegedly suppressed personnel file
of Dr. Gross. Although Petitioner may not have had Dr. Gross'
personnel file from Cape May County before the start of trial,
Petitioner was still able to impeach Dr. Gross regarding his past

disciplinary infractions.  During Petitioner's opening statement,

he argued in pertinent part:

> [.  .  .]  In  addition,  the  Chief  Medical
> Examiner,  Dr.  Elliott  Gross,  acknowledges  that
> many homicide autopsies were performed in the
> presence  of  only  one  doctor,  but  ordered  his
> medical staff to continue in direct violation
> of city law.
>
> This  causes  autopsies  to  be  misdiagnosed.
> Evidence was lost.  Shortcuts were taken, and
> (indiscernible)  reports  were  inaccurate.   So
> as  a  result,  Dr.  Gross  was  fired  from  the
> (indiscernible) Office in 1987 but then-Mayor
> Everett  I.  Coach  (phonetic),  (indiscernible)
> office.
>
> In  March  of  2001,  instead  of  getting
> terminated,  Dr.  Gross  gave  up  his  $142,500  a
> year  job  after  he  (indiscernible)  autopsy
> (indiscernible)  promoting  a  murder  charge
> against  an  innocent  man.   (indiscernible)
> prosecuted  the  charge  of  an  Atlantic  City
> police  office,  Mr.  James  Andross  (phonetic)  of
> murder  of  his  own  wife.   Ms.  Eileen  Andross
> lost  --  Mr.  Andross  lost  (indiscernible)
> suspended  from  his  job,  who  would  be
> vindicated  a  month  before  he  was  to  stand
> trial.
>
> After  two  (indiscernible)  pathologists
> reviewed  Dr.  Gross'  work  and  determined  that
> Mrs.  Andross  died  from  a  coronary  artery
> dissection, a condition that causes a person
> to hemorrhage, a (indiscernible) of Dr. Gross'
> findings  as  asphyxiation.   As  part  of  this
> (indiscernible),  Dr.  Gross  was  banned  from
> performing  unsupervised  autopsies,  and  was
> order  to  perform  20  autopsies  under  the
> supervision  of  State-designated
> (indiscernible) pathologists, as well as to
> observe 20 others.
>
> At  that  time,  after  the  State  medical  exam,
> Mr.  John  Crowpowski  (phonetic),  refused  to

reinstate Dr. Gross' privileges because of his
(indiscernible) remedial tests.

ECF No. 8-1, at 10-11.

Upon cross-examination of Dr. Gross, Petitioner again
attacked Dr. Gross' credibility, eliciting, in pertinent part:

> PETITIONER: Doctor, isn't is also true you
> testified here today that you used to work in
> the New York Medical Examiner's Office; is
> that correct?
>
> DR. GROSS: That's correct.
>
> [. . .]
>
> PETITIONER: Now, Doctor, when you say you left
> the office, did you voluntarily leave, or were
> you fired sir?
>
> DR. GROSS: I was dismissed, as the mayor had
> the right to do.
>
> PETITIONER: And, could you explain to the jury
> why, sir?
>
> DR. GROSS: Yes.  As he announced, he wished to
> make a change in the administrative management
> of the office.
>
> PETITIONER: Sir, did your dismissal have
> anything to do with the deterioration of the
> medical examiner's office in New York?
>
> DR. GROSS: I can only refer you to what the
> mayor said, which had to do -- that he wished
> to make a change in the administrative
> management of the office.
>
> PETITIONER: And, I believe you also testified
> to a Mrs. Eileen Andros; is that correct, sir?
>
> DR. GROSS: I testified about a Ms. Ellen
> Andros, yes.

PETITIONER: And, you did perform her autopsy; is that correct, sir?

DR. GROSS: That's correct.

PETITIONER: And, in doing that autopsy, you mistakenly missed a finding; is that correct?

DR. GROSS: That's not correct. What I said was, that the body exhibited certain findings and at a later date, the microscopic change in the coronary artery was noted, which I had not seen, and I admitted to that error, and have regretted it, as I publicly stated, and will regret it for the rest of my career.

PETITIONER: Sir, are you aware of the consequences behind --

PROSECUTOR: Judge, I'm going to object as to the relevance of that.

THE COURT: What relevance does that have to this case, sir?

PETITIONER: This has all relevance to do with his credibility, Your Honor.

THE COURT: No, it doesn't. Sustained.

ECF No. 8-4, at 26-27.

Petitioner yet again attacked Dr. Gross' credibility during his closing statement, arguing:

The facts are undisputed. Lies kept trying to cover themselves up one after another. Which brings me to the State's next witness, Dr. Elliott Gross.

Now, as I told you and that Dr. Gross admitted, he was indeed fired from the New York Medical Examiner's Office.

Dr. Gross also admitted that he made tremendous errors in the autopsy of Ms. Eileen

> Henry (Phonetic), that led to murder charges
> against an innocent man.
>
> [. . .]
>
> Take into consideration Dr. Gross' background.
> Everything he testified to must be looked at
> under a microscope. When I tried to dig
> further into Dr. Gross' background, I was
> stopped by the Judge.
>
> When I tried to put Dr. Gross' credibility on
> the table, I was stopped for some reason. No
> matter if I was stopped or not. Dr. Gross
> admitted himself to his shoddy background.

ECF No. 8-6, at 83-84.

The record demonstrates that, even if Petitioner did not have Dr. Gross' personnel file, Petitioner still used Dr. Gross' past disciplinary infractions to impeach his credibility on multiple occasions. Thus, Petitioner's argument that he "never had the opportunity" to impeach Dr. Gross is belied by the trial transcripts. Petitioner does not allege what additional information Dr. Gross' personnel file contained that would have added to the impeachment of Dr. Gross' credibility.

Moreover, Petitioner is also unable to demonstrate that Dr. Gross' personnel file was material evidence. Knowing that Dr. Gross had made a mistake in the performance of an autopsy for another case, the State chose to also present the testimony of Dr. Ian Hood, a Deputy Chief Medical Examiner in Philadelphia. See ECF No. 8-19, at 16. Dr. Hood testified at trial that, based upon his own review of the autopsy report and other evidence in the

case, he agreed with Dr. Gross' finding as to the victim's manner of death. See ECF No. 8-4, at 35-36. Thus, even if Dr. Gross' credibility had been impeached, Dr. Hood testified as to the same findings. See id. at 36. Therefore, Petitioner has not demonstrated that Dr. Gross' personnel file was "material" evidence that was suppressed by the State. Accordingly, the state courts' adjudication of this claim was not contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to relief on this claim.

    *ii. Other Documents*

Petitioner also contends that the State committed <u>Brady</u> violations by withholding a trace evidence report, the lab notes of FBI forensic analyst Hutchins, and a "biochemical analysis and questionnaire report." See ECF No. 1-1, at 6-10. When Petitioner raised these claims during his PCR proceedings, the PCR Court held, in pertinent part:

> There are a host of documents, enumerated across several briefs (most notably in the appendix of his pro se supplemental brief), which the Petitioner claims he never received. However, he has not gone into detail about how the remaining missing documents could have altered the outcome of trial. If the alleged suppression of evidence is a violation of due process, it must be material, favorable to the accused and actually suppressed. *See*, <u>Nelson</u>, <u>supra</u>, 155 <u>N.J.</u> at 497. Here, the Petitioner has not asserted how those remained documents would have been favorable or material. [FN 4]. Thus the petitioner does not make a prima facie case of a <u>Brady</u> violation. [FN 4:

> Further, several of the items which are
> alleged missing, the State argues were
> included in the discovery file and that some
> of those "missing" items were even utilized by
> the defense at trial. However, this inquiry
> as to the remaining documents is moot because
> the Petitioner has not alleged the materiality
> or favorability of those items.]

ECF No. 8-27, at 20-21.

Addressing the alleged withholding of Ms. Hutchins' report and lab notes later in its opinion, the PCR court also stated:

> The Petitioner takes an additional issue with
> [Ms. Wanko's] testimony – that he did not
> receive the curriculum vitae of Ms. Hutchins
> and case notes prior to trial. This claim is
> meritless, as the Petitioner actually cross
> examined [Ms. Wanko] based on the case notes,
> showing that he had received those items.
> Additionally, the State, through their first
> brief and attached exhibits, have shown that
> Ms. Hutchins' curriculum vitae was provided in
> the Discovery file, thus this claim is
> meritless.

Id. at 22.

The Appellate Division affirmed the PCR court's holding, stating that Petitioner's claim lacked sufficient merit to warrant discussion in a written opinion. See ECF No. 8-29, at 9-10.

Here, Petitioner has not demonstrated that the trace evidence report, Ms. Hutchins lab notes, or the biochemical analysis and questionnaire were suppressed. "A petitioner has the burden of demonstrating the State withheld or suppressed evidence." Neals v. Warren, No. 13-4398, 2017 WL 751427, at *8 (D.N.J. Feb. 27, 2017) (citing Maynard v. Gov't of Virgin Islands, 392 F. App'x

105, 119 (3d Cir. 2010)).  Despite Petitioner's assertions, the record provided by the State indicates that these documents were, in fact, turned over to Petitioner during discovery.  See ECF No. 8-19, at 20-21, 31-52.  However, even if these documents had not been provided to him during discovery, Petitioner has still not demonstrated that the documents would have, with a reasonable probability, changed the result of his proceeding.  See Kyles, 514 U.S. at 441.

Petitioner asserts that the trace evidence report, which analyzed hair taken from the crime scene, would have demonstrated to the jury that none of the hair found at the scene belonged to him.  See ECF No. 1-1, at 11 ("[The report] also showed that the petitioner was 'excluded' to the remaining hair that did not belong to the victim.").  However, a review of the report indicates that a majority of the hair taken from the crime scene was "similar" to that of the victim's hair.  See ECF No. 8-19, at 31-32.  The report states that there were numerous hairs collected that did not match the victim's hair or any of the submitted suspect hairs, and that there were a few hairs that had insufficient characteristics or no comparative value to be able to draw a conclusion.  See id.  The report does not state, as Petitioner alleges, that he was "excluded" from being a contributor to any of the trace evidence. Petitioner has not demonstrated how this report would have made a different result reasonably probable.

Petitioner also alleges that he should have been provided with Ms. Hutchins' lab notes in order to impeach Ms. Wanko.  See ECF No. 1-1, at 14-15.  Petitioner contends that Ms. Hutchins' lab notes contained the "only" true examination of Petitioner's prints as compared to the handprints from the crime scene and that he should have been able to cross-examine Ms. Wanko with Ms. Hutchins' lab notes.  Upon review of the record, it is clear that Ms. Wanko conducted her own independent examination and comparison of Petitioner's palm print to the print found at the scene of the crime.  See ECF No. 8-3, at 4-28.  It is also clear that Ms. Hutchins' lab notes rendered the same conclusion that Ms. Wanko did – that the palm print found from the crime scene matched Petitioner's.  See ECF No. 8-20, at 37-38.  Thus, even if Petitioner did not have access to Ms. Hutchins' lab notes to cross examine Ms. Wanko – which he clearly did – the notes would not have, with a reasonable probability, changed the result of Petitioner's proceeding.

Finally, Petitioner argues that the biochemical analysis questionnaire would have demonstrated to the jury that a shoelace was used to strangle the victim, not a t-shirt.  See id. at 11-12.  The questionnaire states, "If a weapon was used, indicate the weapon and injuries it may have caused and to whom."  See ECF No. 8-19, at 42.  Whoever authored the unsigned document wrote, "Knife & shoe lace."  See id.  Petitioner alleges that if he had been

provided with this questionnaire, it would have demonstrated that "the State was aware that the t-shirt was not the weapon used" and that he would have been able to use this information to impeach Dr. Gross' testimony. See id. at 11-13. However, Petitioner is unable to demonstrate that he suffered prejudice from this allegedly withheld evidence because he had access to the same information about the shoelace prior to trial. See ECF No. 12, at 88; see also ECF No. 1-1, at 11-12. Indeed, Petitioner attempted to introduce the information about the shoelace as a possible murder weapon at trial, although his attempt was ultimately denied. See id. ("[P]etitioner tried to show the jury that page three had stated, 'The medical examination revealed the shoelace (item 13) was submitted as being the weapon used to strangle victim.'"). During cross-examination of one of the crime scene detectives, Petitioner tried to introduce the State's "request for examination of blood and other bodily fluids" – a document which accompanies the biochemical analysis questionnaire. See ECF No. 12, at 88; see also ECF No. 8-19, at 42. This request form indicated that a shoelace had been submitted for testing at the State's crime lab, and that the shoelace had been submitted as a possible murder weapon. See ECF No. 12, at 86 ("The medical examination revealed a shoelace, submitted as being item 13, being the item used to strangle the victim. The shoelace could not be matched as belonging to anything in the apartment.") Thus, Petitioner clearly

had access to the information that the shoelace may have, at one time, been considered a possible murder weapon. Accordingly, Petitioner's argument that if he had the questionnaire, he would have been able to present evidence that the murder weapon was actually a shoelace and cross examine Dr. Gross with that information, is without merit.

Given the foregoing, the allegedly withheld documents did not render the verdict in Petitioner's trial unworthy of confidence. See Kyles, 514 U.S. at 434. Petitioner's case involved "strong, compelling scientific evidence showing beyond a reasonable doubt that [he] committed the charged offenses." Nevius, 2012 WL 2361516, at *13. The evidence against Petitioner was, as the Appellate Division stated, "overwhelming." See id. at *15. Petitioner has not demonstrated that any Brady violations occurred or that the state courts' adjudication of his Brady claims was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief on this ground.

### C. State's Use of Perjured Testimony

In Ground Three, Petitioner argues that the State elicited perjured testimony from witnesses Maureen Lo-Beer and David Vai. See ECF No. 1-1, at 16. The United States Supreme Court has long held that the State may not knowingly use perjured testimony to obtain a conviction. See Giglio v. United States, 405 U.S. 150,

153 (1972).  A petitioner's due process rights under the Fourteenth Amendment are violated where the State either solicits, or fails to correct, false testimony.  See Napue v. People of State of Ill., 360 U.S. 264, 269 (1959).  "[I]f there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," then a petitioner's conviction must be set aside.  United States v. Agurs, 427 U.S. 97, 103 (1976).  To establish a due process violation resulting from perjured testimony, a petitioner must show that: (1) the witness provided false testimony; (2) the government knew or should have known that the testimony was false; (3) the false testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict.  See Lambert v. Blackwell, 387 F.3d 210, 242 (3d Cir. 2004).

### i. Lo-Beer Testimony

Petitioner contends that the State knowingly used perjured testimony from witness Maureen Lo-Beer, a forensic scientist at the State Police Laboratory's DNA unit.  See ECF No. 1-1, at 19. Petitioner alleges, in part:

> On direct examination, Low-Beer when asked by the State how she came about determining in fact there was a mixture [of DNA]; Low-Beer testifies because she had found four alleles in five loci, she knew she had a mixture or combination.  She testifies she subtracted in all areas where there were four alleles.  Low-Beer explains she took out the victims profile and got a single source.  Low-Beer explains

she had "Nevius's" alleles from the mixture when asked by the State. (19T 150-4 to 152-16). This was the petitioner's claims to the P.C.R. Court that the State had knowingly used perjured testimony concerning Ms. Low-Beer's mixture results and conclusions. While having direct knowledge that Mr. Klama "NEVER" swabbed any of the blood stained areas on specimen 10 (t-shirt). Klama only sent Low-Beer a swabbing from the shirt of possible skin cells labeled (#10A) (19T 68-2 to 69-12; 19T 70-2 to 71-9). This was petitioner's proof that the D.N.A. evidence against him was false.

Id. at 19.

Although Petitioner's argument is unclear, it appears he is alleging that Ms. Lo-Beer provided false testimony when she stated that she received a mixed DNA result. This claim appears premised upon the argument that since Ms. Lo-Beer never tested a blood stain from the t-shirt, that she could not have eliminated the victim as a contributor to the mixed DNA result.

At trial, Raymond Klama, a forensic scientist in the State Police Laboratory's Criminalistics Unit who is responsible for preparing evidence for DNA testing, testified that he did not send blood stain samples from the t-shirt found at the crime scene to the DNA Unit. See ECF No. 8-3, at 35-36. Mr. Klama testified that he only sent swabs he had taken from the collar and armpit of the t-shirt in an effort to find possible epithelial cells. See id. When Ms. Lo-Beer testified, she stated that she had tested the swabs from the t-shirt looking for skin cells. See id. at 78-

79. Ms. Lo-Beer stated that when she tested the swabs, she discovered a mixed DNA result, which included a DNA profile from the victim and another individual. See id. at 75. Ms. Lo-Beer explained that she was able to identify the victim's DNA as a partial contributor to the mixed result because she had been provided with a control blood sample from the victim. See id. Ms. Lo-Beer testified that the mixed DNA results were likely due to the fact that the t-shirt was covered in blood spatter and "when you swab for epithelial cells, you'll also pick up some DNA from the blood spatters that were present also." Id. at 87. Ms. Lo-Beer expressly stated, however, that she did not test any blood stains from the t-shirt – only the swabs for skin cells. See id. at 78-79, 86-87.

> PETITIONER: . . . But, before I get to that, you just said that you didn't test the stain; did you not?
>
> MS. LO-BEER: No, I said a blood stain was not tested.
>
> [. . .]
>
> PETITIONER: So, when the neck of the t-shirt and the underarms supposedly were swabbed you weren't looking for ownership of the t-shirt or what were you looking for?
>
> MS. LO-BEER: We were looking for epithelial cells from that t-shirt that would indicate who might have worn that garment at one time.

Id.

When Petitioner raised this claim about Ms. Lo-Beer's

33

allegedly perjured testimony during his PCR proceedings, the PCR court rejected it, stating in pertinent part:

> The Petitioner also claims that the testimony of Maureen Low-Beer was perjured and or false. There is no basis for this assertion. Further, Petitioner presented his own expert at trial who rebutted Low-Beer's testimony. Though the Petitioner sees inconsistencies and other problems with Ms. Low-Beers testimony he had the opportunity, and took advantage of the opportunity to rebut her testimony.

ECF No. 8-27, at 23.

Here, it appears that Petitioner misunderstood Ms. Lo-Beer's trial testimony. Ms. Lo-Beer testified that the DNA from the swab for skin cells on the t-shirt contained a mixture of DNA from the victim and from another individual. The import of Ms. Lo-Beer's testimony was that although she only tested the swabs from the t-shirt for skin cell DNA, some of the victim's DNA from the blood splatters on the t-shirt was also present. Ms. Lo-Beer explained that she was able to determine the victim a partial contributor to the DNA mixture based upon a control sample of the victim's blood she had been given – not based upon the fact that she had tested the t-shirt for blood stains. Indeed, Ms. Lo-Beer specifically clarified that she did not test blood stains from the t-shirt. Thus, Ms. Lo-Beer did not falsely testify about testing blood from the t-shirt because she did not, as she stated, test any blood stains from the t-shirt. Accordingly, Petitioner has not shown that State elicited perjured testimony from Ms. Lo-Beer.

The state courts' adjudication of this claim was not contrary to, or an unreasonable application of, clearly established federal law.

### ii. Vai Testimony

Petitioner argues that the State also permitted Officer David Vai to falsely testify that he lifted two handprints from the crime scene, despite his previous testimony that he had only lifted one. See ECF No. 1-1, at 21-22. In support of his claim, Petitioner points to Officer Vai's testimony from the trial of Petitioner's co-defendant, Boston, where Officer Vai stated that the only print he lifted from the crime scene was from the victim's nightstand. See id. Petitioner states that at his own trial, Officer Vai testified that he had lifted two handprints, one from the victim's nightstand and one from victim's closet door. See id. Petitioner asserts, therefore, that Officer Vai knowingly provided false testimony at Petitioner's trial when he testified that he found two handprints. See id.

At Petitioner's trial, Officer Vai did testify that he lifted two handprints from the scene of the crime – one from the victim's nightstand and one from a closet door. See ECF No. 12, at 21-22. Officer Vai testified that fingerprint taken from the closet door "was of no evidential value," but the print taken from the nightstand was ultimately able to be sent for identification at the Federal Bureau of Investigations ("FBI") Laboratory in

Quantico, Virginia. See id. at 24-25.

Petitioner first raised this claim about Officer Vai's allegedly perjured testimony during his PCR proceedings. See ECF No. 8-13, at 5. Petitioner relief upon Officer Vai's testimony from co-defendant Boston's trial as evidence. See ECF No. 8-20, at 81. The PCR court denied the claim stating, in pertinent part:

> This claim is without merit. Though there were differences in Vai's testimony between the trial of William Boston and the Petitioner's trial, there is nothing to suggest that his subsequent testimony was perjured. In petitioner's trial Vai did reference two latent prints, while he only spoke of one in the trial of William Boston. When prompted, Vai, testified that he only found the one print "at that time." Whereas petitioner suggests that Vai only found one print in general. Petitioner also asserts that this print was unusable by Vai's own admission, but then Vai used it to identify the Petitioner. In fact, Vai did testify that he originally could not use the print, but later, found it useable when compared to that of the Petitioner; this is not perjury. However, at co-defendant's trial, the Prosecutor did not elicit testimony about the recovery of the palm print from Officer Vai on direct. This was not perjury. Clearly, there were different levels of proof as against each defendant, and the State would have elicited such proofs at each trial.

ECF No. 8-27, at 22.

Here, Petitioner has not shown that even if Officer Vai provided false testimony about discovering a second print from the victim's closet door, that there is a reasonable likelihood that the false testimony could have affected the judgment of the jury.

36

See United States v. Agurs, 427 U.S. 97, 103 (1976).  Officer Vai expressly stated during Petitioner's trial that the handprint on the closet door had no evidential value.  See ECF No. 12, at 21-22.  Moreover, the prosecutor never argued, and no witnesses testified, that the handprint from the closet door matched Petitioner or that it was indicative of Petitioner's guilt in any way.  See generally ECF Nos. 1-7, 12.  Thus, there is no indication that the reference to this second handprint could reasonably have affected the judgment of the jury, as it had no evidential value.  Accordingly, the state courts' adjudication of this claim was not contrary to, or an unreasonable application of, clearly established federal law.  Petitioner is not entitled to relief on this claim.

### D. Sixth Amendment Confrontation Clause

In his fourth ground for relief, Petitioner asserts that Officer Vai's testimony about the Automated Fingerprint Identification System ("AFIS") and Ms. Wanko's testimony about another forensic analyst, Laura Hutchin's, work violated Petitioner's rights under the Confrontation Clause.  See ECF No. 1-1, at 25-33.  Specifically, Petitioner alleges that he should have been able to confront someone from AFIS about the handprint results the system generated and that he should have been able to confront Ms. Hutchins, who initially conducted the examination of his palm print at the FBI laboratory, about the work that she

conducted.

The Confrontation Clause under the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI; see also Crawford v. Washington, 541 U.S. 36, 42 (2004). This clause enables defendants to bar out-of-court "testimonial" statements made by witnesses who do not appear at trial. See Crawford, 541 U.S. at 53-54. Generally, a petitioner establishes a violation under the Conference Clause "by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness.'" See Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974). However, alleged violations of the Confrontation Clause are still subject to harmless error review. See Boyd v. Johnson, No. 18-965, 2019 WL 316025, at *9 (D.N.J. Jan. 24, 2019) (citing Fry v. Pliler, 551 U.S. 112, 116 (2007)). Therefore, for a habeas petitioner to prevail on a Confrontation Clause violation claim, he must show that not only was he prohibited from engaging in an otherwise appropriate cross-examination, but also that this limitation had a "substantial and injurious effect or influence in determining the jury's verdict." See Fry, 551 U.S. at 116.

### i. AFIS

Petitioner argues that his Sixth Amendment confrontation

rights were violated when the state used "hearsay testimony" about AFIS and how the system classified the fingerprints collected from the crime scene as not sufficient.[2] See ECF No. 1-1, at 25-27. Here, Petitioner cannot demonstrate that the state court's adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law because the Supreme Court has never held that, "in the context of the confrontation clause, it was necessary to introduce testimony concerning the method of using AFIS." Marshall v. Hedgepeth, No. 10-565, 2012 WL 1292493, at *13 (E.D. Cal. Apr. 16, 2012); see also Rabaia v. New Jersey, No. 15-4809 2019 WL 699954, at *5 (D.N.J. Feb. 20, 2019) (holding that a petitioner could not demonstrate the state court's adjudication of his claim was contrary to or an unreasonable application of federal precedent where the United States Supreme Court had never ruled on the issue); Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

However, even if Officer Vai's testimony regarding AFIS could

---

[2] It appears this claim raised by Petitioner is unexhausted because it was not presented on direct appeal or during Petitioner's PCR proceedings. See generally ECF Nos. 10-17. To properly exhaust a claim for habeas review, a petitioner is required to invoke "a complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). However, to the extent that a petitioner's constitutional claims are unexhausted or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). See Taylor v. Horn, 504 F.3d 416, 427 (3d Cir. 2007); see also Bronshtein v. Horn, 404 F.3d 7000, 728 (3d Cir. 2005).

be construed as violating Petitioner's rights under the Confrontation Clause, this alleged violation is still subject to harmless error analysis. See Fry, 551 U.S. at 116. Here, Petitioner has not demonstrated how his inability to confront "whoever had supplied" Officer Vai with the information from AFIS had a substantial and injurious effect or influence in determining the jury's verdict. Officer Vai's testimony was that he sent Petitioner's fingerprints "to AFIS" and the results "came back not sufficient." See ECF No. 12, at 22. This information was not detrimental or unfavorable to Petitioner's case. The information only indicated that the fingerprints located at the crime scene were insufficient for comparison.

Moreover, as the Appellate Division stated in their decision on direct appeal, "the critical evidence directly implicating defendant in the victim's murder was the testimony from the other experts who personally conducted the analysis of defendant's DNA and palm prints and who individually testified at trial." Nevius, 2012 WL 2361516, at *13. It was this combination of expert proofs which "placed defendant in the victim's apartment though he denied ever being there, and placed defendant in possession of one of the murder 'weapons'—the T-shirt." Nevius, 2012 WL 2361516, at *13. Thus, Petitioner has not demonstrated that his inability to confront "whoever had supplied" Officer Vai with the information from AFIS had a substantial and injurious effect or influence in

determining the jury's verdict. Petitioner is not entitled to relief on this claim.

### ii. FBI Laboratory Report

Petitioner argues that his rights under the Confrontation Clause were also violated when the State did not present the testimony of Ms. Hutchins, but only the testimony of her supervisor, Ms. Wanko. See ECF No. 1-1, at 28-33. The gravamen of Petitioner's argument is that he should have been provided the opportunity to question Ms. Hutchins who initially worked on the fingerprint report because "Wanko admits she did not physically prepare the report admitted against petitioner but only signed it after Hutchins prepared it." See id. at 31 (emphasis in original).

Petitioner first raised this claim to the PCR court. See ECF No. 9-1, at 121-123 (Jan 24, 2015). In support of his argument that Ms. Wanko did not physically prepare the report but merely signed it, Petitioner relied on Ms. Wanko's testimony at the trial of his co-defendant. See id. at 122. In denying Petitioner's claim, the PCR court found that Petitioner's Sixth Amendment rights had not been violated because Ms. Wanko had indeed participated in the fingerprint analysis and had testified at trial based upon her own conclusions. See id. Moreover, the PCR court noted that it was Ms. Wanko's report that was admitted at trial and that Ms. Wanko had a "real and direct involvement" with the findings. See id. The PCR court stated that Ms. Wanko did not engage in the

kind of "surrogate testimony" that the United States Supreme Court had cautioned against.  See id.

Here, the state court's adjudication of this claim was not contrary to, or an unreasonable application of clearly established federal law.  The United States Supreme Court has held that "the Confrontation Clause requires the authentication of testimonial evidence by a person who certified the evidence, personally performed the work to produce the evidence, or observed the performance of such work."  Stevens v. Warren, No. CV 13-2831, 2017 WL 5889811, at *7 (D.N.J. Nov. 28, 2017) (citing Bullcoming v. New Mexico, 564 U.S. 647, 657 (2011)).  Ms. Wanko testified that she conducted her own independent analysis of the prints submitted to the FBI laboratory and arrived at her own opinion as to whether the prints matched.  See ECF No. 8-3, at 9-13.  The following portion of Ms. Wanko's testimony at co-defendant Boston's trial, which Petitioner referenced, highlights this point:

> PROSECUTOR: Ms. Wanko, do you remember the name of the analyst who initially worked on this comparison?
>
> MS. WANKO: Yes, I do.
>
> PROSECUTOR: What was her name?
>
> MS. WANKO: Her name was Laura Hutchens.
>
> PROSECUTOR: Now, when Ms. Hutchens made her findings, did you merely accept her findings, and put your name on the report?

MS. WANKO: No. I thoroughly check all of her work.

PROSECUTOR: Okay. And, how do you do that?

MS. WANKO: I go step by step behind her with -- through a separate analysis, and comparison, and --

PROSECUTOR: So, do you actually do the same comparison that she would have done?

MS. WANKO: Yes, I do.

PROSECUTOR: And, is that called verification?

MS. WANKO: Actually, verification comes as a last step.

PROSECUTOR: I'll show you what's been marked S67 for identification, and ask you if you can identify that copy?

MS. WANKO: Yes. This is a copy of the --

PROSECUTOR: Well, you can't show it to the jury.

MS. WANKO: Right. This is a copy of the case notes, which were prepared by Laura Hutchens.

PROSECUTOR: And, does it indicate whether there was any verification of her work done, and by whom?

MS. WANKO: Yes.

PROSECUTOR: What does it say?

MS. WANKO: She, in her case notes, she identified the palm print, which we had labeled Q1, with the left palm print of Tom Nevius. I again compared it, and identified it, and then we had a third specialist look at it, and do a separate comparison, and separate analysis, and to verify the identification.

> PROSECUTOR: Okay. So, not only did [Ms. Hutchins] compare it favorably, but you reviewed it and compared the latent with Mr. Nevius' palm print, and a third analyst confirmed what your opinion was, and Laura Hutchen's opinion; is that correct?
>
> MS. WANKO: Yes.

ECF No. 8-20, at 37-38.

As the record demonstrates and the PCR court determined, Ms. Wanko's testimony does not fall within the type of testimony cautioned against by the Supreme Court where an analyst merely presents the report of another. See Bullcoming, 564 U.S. at 662. Here, there is no question that Ms. Wanko's expert opinion was informed by her own independent analysis. Accordingly, the state courts' determination that Petitioner's rights under the Confrontation Clause were not violated was not contrary to, or an unreasonable application of clearly established federal law. Petitioner is not entitled to relief on this claim.

### E. Ineffective Assistance of Appellate Counsel

In his fifth ground for relief, Petitioner argues that his appellate counsel was ineffective for failing to adequately investigate his case and for failing to litigate issues concerning withheld evidence, perjured testimony, and confrontation violations. See ECF No. 1-1, at 33. Petitioner states that as a result of appellate counsel's "many failures," Petitioner was deprived of a fair direct review. See id. at 37.

Petitioner raised this argument of ineffective assistance of appellate counsel during his PCR proceedings. See ECF Nos. 12-16. The PCR court denied each of these claims, finding that Petitioner had not demonstrated the prejudice prong of Strickland. See ECF No. 8-27. The Appellate Division affirmed the PCR court's decision. See Nevius, 2017 WL 588186, at *2-4.

The Sixth Amendment of the United States Constitution provides: "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). A showing of ineffective assistance of counsel requires two components to succeed. Id. at 687. The two requisite proofs are as follows: (1) a defendant must show that counsel's performance was deficient; and (2) the defendant must show prejudice. Id.

When a convicted defendant complains of deficient performance, the defendant's burden of proof is to show that the conduct of counsel fell below an objective standard of reasonableness. Id. at 688. Hence, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689. To combat the natural tendency for a reviewing court to speculate whether a different strategy at trial may have been more effective,

the Supreme Court has "adopted the rule of contemporary assessment of counsel's conduct." Maryland v. Kulbicki, 136 S. Ct. 2, 4 (2015) (quoting Lockhart v. Fretwell, 506 U.S. 364, 372 (1993)). As to proving prejudice under Strickland, "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." 466 U.S. at 693. To succeed on this proof, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Hinton v. Alabama, 134 S. Ct. 1081, 1088 (2014) (quoting Padilla v. Kentucky, 559 U.S. 356, 366 (2010)). A reasonable probability is a probability which sufficiently undermines confidence in the outcome of the trial. Strickland, 466 U.S. at 694.

Generally, appellate counsel has no obligation to raise every claim on direct appeal. See Smith v. Robbins, 528 U.S. 259, 288 (2000); United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999). The decision of which issues to raise on appeal is a strategic choice. See Smith, 528 U.S. at 288 (citing Jones v. Barnes, 463 U.S. 745 (1983)). The chief component of effective appellate advocacy is the winnowing out of weaker claims in favor of those with a greater chance of success. See Jones, 463 U.S. at 753. "Declining to raise a claim on appeal, therefore, is not deficient performance unless that claim was plainly stronger than those

actually presented to the appellate court." <u>Davila v. Davis</u>, 137 S. Ct. 2058, 2067 (2017).

Here, the state courts' adjudication of Petitioner's ineffective assistance of appellate counsel claims was not contrary to, or an unreasonable application of, clearly established federal law. Petitioner has not demonstrated that he was prejudiced by appellate counsel's failure to raise the claims of <u>Brady</u> violations, perjured testimony, or Confrontation Clause infringements. Nor has Petitioner demonstrated that these claims were plainly stronger than those that were raised on appeal. As discussed more fully above, Petitioner has not shown that any <u>Brady</u> violations occurred, that any of the witnesses perjured themselves, or that his rights under the Confrontation Clause were violated. Given the insufficient merit of these claims, it cannot be said that these issues were plainly stronger than the ones appellate counsel did raise on appeal. <u>See Davila</u>, 137 S. Ct. at 2067. Accordingly, Petitioner is not entitled to relief on these claims.

## IV.   CERTIFICATE OF APPEALABILITY

The AEDPA provides that an appeal may not be taken to the court of appeals from a final order in a § 2254 proceeding unless a judge issues a certificate of appealability on the ground that "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court will

deny a certificate of appealability because jurists of reason would not find it debatable that dismissal of the Petition is correct.

**V.    CONCLUSION**

For the above reasons, the § 2254 habeas petition is denied, and a certificate of appealability shall not issue.  An appropriate Order follows.


Dated: December 11, 2019                     s/ Noel L. Hillman
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.